# UNITED STATES DISTRICT COURT
## Eastern District of Virginia
### (ALEXANDRIA DIVISION)

PHILLIP B. LEISER, Esq.,         )
                                         )

     and                  )
                                         )

CREATIVE LEGAL SOLUTIONS, PLLC,  )
(*f.k.a.* The Leiser Law Firm, PLLC)     )
                                         )

                   Plaintiffs,   )
            v.                    )

CHIEF JUSTICE DONALD W. LEMONS,  )
*In his Official Capacity as Chief Justice of the*  )
*Supreme Court of Virginia*           )

     and                  )

THE HONORABLE J. MARTIN BASS    )
*In his Official Capacity as Judge, Pro Tempore*  )
*Of the Circuit Court of Fauquier County, Virginia*  )

                   Defendants.  )

Civil Action No. <u>1:18-cv-349-LMB/MSN</u>

**Complaint for Declaratory Relief under 42 U.S.C. § 1983**

## CIVIL RIGHTS COMPLAINT AND REQUEST FOR DECLARATORY RELIEF

    COME NOW Plaintiffs, PHILLIP B. LEISER, Esq. ("Leiser"), *pro se,* and CREATIVE

LEGAL SOLUTIONS, PLLC (*f.k.a.* THE LEISER LAW FIRM, PLLC),[1] by Counsel, and file

this civil rights action under 42 U.S.C. § 1983 (The Civil Rights Act of 1871, *as amended*);  and

28 U.S.C. §§ 2201 and 2202 (The Declaratory Judgment Act, *as amended*), against Defendants,

CHIEF JUSTICE DONALD W. LEMONS, in his official capacity as Chief Justice of the

Virginia Supreme Court ("VSC"), and THE HONORABLE J. MARTIN BASS ("the trial court"

or "Judge #2"), in his official capacity as Judge, *pro tempore,* of the Circuit Court of Fauquier

County, Virginia, ("FQR") whose non-final order in a civil lawsuit is at issue in this case.

---

[1] In order to avoid sounding stilted, "Leiser" will be used in the singular, to collectively refer to both Plaintiffs.

## I. PARTIES

### A. Plaintiffs

1. Creative Legal Solutions, PLLC, *f.k.a.* The Leiser Law Firm, PLLC, *f.k.a.* Leiser, Leiser & Hennessy, PLLC (hereinafter, "Leiser") is a professional limited liability company situated in Fairfax County, Virginia, organized under the laws of the Commonwealth of Virginia, and licensed to conduct business there. Leiser is therefore a recognized entity who may sue under 42 U.S.C. § 1983 as a person deprived of his rights secured by the Constitution and laws of the United States. *Allee v. Medrano*, 416 U.S. 818, 819 at fn. 13 (1974).

2. Phillip B. Leiser, Esq. is a natural person and an attorney licensed to practice law in the Commonwealth of Virginia, who resides and conducts business in Fairfax County. He is also the sole owner and sole member/manager of the PLLC identified in the previous paragraph.

### B. Defendants

1. The Honorable J. Martin Bass (Judge #2) is a retired Virginia circuit court judge who was sitting by special designation as the presiding judge, *pro tempore*, over the FQR litigation described in Part III, *supra.*, after having been specifically assigned by VSC to preside over that case, after his predecessor, Judge #1, had recused himself from the case. Judge Bass is being sued in only his official capacity as such, and is therefore a "person" subject to this action for declaratory relief under 42 U.S.C. § 1983, because "judicial immunity [does] not extend to injunctive and declaratory relief under § 1983." *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719 (1980).[2]

---

[2] Judges are absolutely immune from suits for damages when acting in their official capacity.

2. Chief Justice Donald W. Lemons is the Chief Justice of VSC. He is being sued in only his official capacity as such, and is therefore a "person" subject to this action for declaratory relief under 42 U.S. C. § 1983, because "judicial immunity [does] not extend to injunctive and declaratory relief under § 1983." (See fn. 27, *supra*.).

## II. SUBJECT MATTER AND *IN PERSONAM* JURISDICTION, AND VENUE

1. Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983, for deprivation of their rights secured by the Fourteenth Amendment to the United States Constitution.

2. This Court has original subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it raises federal questions arising under the Constitution and laws of the United States.

3. This Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4) since it is a § 1983 civil rights action authorized by law.

4. This Court has authority to grant declaratory relief in this action under 28 USC §

---

*See Pierson v. Ray*, 386 U.S. 537 (1967). However, absolute judicial immunity does "not extend to plaintiff's action for injunctive and declaratory relief under Section 1983, 42 U.S.C." *See Pulliam v. Allen*, 466 U.S. 522, 527 (1984); *Timmerman v. Brown*, 528 F.2d 811, 814 (4th Cir. 1975). The SCOTUS decision in *Pulliam* finally settled a circuit split on judicial immunity barring declaratory relief. Yet, even then, SCOTUS carefully clarified that it had "never held that judicial immunity absolutely insulates judges from declaratory or injunctive relief with respect to their judicial acts." *Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, 446 U.S. 719, 735 (1980). And in fact, the High Court acknowledged in 1879 that judicial immunity did not insulate state Judge J.D. Cole of Pittsylvania County, Virginia from certain liability under the Fourteenth Amendment because "[t]he prohibitions of the Fourteenth Amendment are directed to the States . . . which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial." *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879); see also *Mitchum v. Foster*, 407 U.S. 225, 240 (1972) ("It is clear from the legislative debates surrounding passage of § 1983's predecessor that the Act was intended to enforce the provisions of the Fourteenth Amendment 'against State action, . . . whether that action be executive, legislative, or judicial.' Proponents of the legislation noted that state courts were being used to harass and injure individuals, either because the state courts were powerless to stop deprivations, or were in league with those who were bent upon abrogation of federally protected rights.").

1342(a)(4) because this is an action providing for the protection of civil rights.

5. This Court has authority to grant declaratory relief in this action under 28 U.S.C. §§ 2201 and 2202, "the Declaratory Judgment Act," because this is an action requesting a declaration of the parties' rights.

6. This Court may exercise *in personam* jurisdiction over Defendants, both of whom presumably reside in and engage in their official duties in this District.

7. Venue is properly laid in the Eastern District of Virginia, Alexandria Division, pursuant to 28 U.S.C. § 1391(b)(1) and (2), because all of the actions giving rise to these claims arose in this district.

## III.    RELIEF SOUGHT BY PLAINTIFFS

Leiser invokes the Civil Rights Act of 1871, codified at 42 U.S.C. § 1983, to obtain declaratory relief against a Virginia state circuit court trial judge, as well as VSC, for their deprivation of Leiser's substantive and procedural due process rights, guaranteed by the Fourteenth Amendment.  Leiser is a party-defendant to an intentional tort lawsuit filed in the Fauquier County Circuit Court ("FQR") by the plaintiff, August McCarthy, Esq., and his former counsel, Daniel L. Hawes, Esq.  This § 1983 Complaint seeks redress, through a declaration by this Court, that the trial court's 11/1/16 order granting McCarthy's motion to strike Leiser's pleadings filed in support of his motion for sanctions; and its dismissal of McCarthy's former counsel (Hawes) as a party-respondent to that motion for sanctions, on the basis that it could not exercise *in personam* jurisdiction over him; along with its "pocket veto" of his motion to reconsider ("MTR") that order were unconstitutional.  By depriving Leiser of the meaningful opportunity to be heard on his motion for sanctions, Judge #2 violated Leiser's right to procedural due process of law.  And by ignoring well-settled legal doctrines concerning: (a) the

factors that should inform the proper exercise of (i) a trial court's discretion, and (ii) its exercise of *in personam* jurisdiction; and (b) the resolution of ambiguities in a trial court's order; the trial court deprived Leiser of his substantive due process rights. As with any and every litigant, Leiser had the right to rely on well-settled legal principles that should have governed the particular dispute in which he was involved, rather than be subjected to the whim of Judge #2.

This § 1983 Complaint also seeks relief against VSC's subsequent refusal of Leiser's petition for appeal and its denial of his petition for rehearing. By ignoring the reversible errors committed by Judge #2, through his disregard of well-settled principles of law, VSC deprived Leiser of the protection from vexatious litigation that Virginia's sanctions statute, VA. CODE ANN. § 8.01-271.1, provides. In so doing, VSC deprived Leiser of his right to substantive due process of law—his right to rely upon settled law, including the sanctions statute, to govern his substantive rights. And because VSC's perfunctory orders refusing Leiser's petition for appeal and denying his petition for rehearing were handed down without explanation, they *ipso facto* unconstitutionally deprived (or what should be deemed an *ipso facto* deprivation) Leiser of his right to procedural due process of law. Moreover, in light of VSC's characterization of its denials of discretionary appellate review as decisions that are "on the merits," *Sheets v. Castle*, 559 S.E.2d 616, 619 (2002), VSC's refusal of Leiser's petition for appeal constituted a decision "on the merits," and tacitly affirmed the trial court's unconstitutional order. For that reason, the trial court's violations of Leiser's rights to both substantive and procedural due process of law, safeguarded by § 1 of the 14th Amendment to the United States Constitution, are attributable, as well, to VSC.

# IV.    MATERIAL PROCEEDINGNS IN OTHER COURTS

## A.  McCarthy's Intentional Tort Complaint Filed Against Leiser in FQR

On 9/19/13, McCarthy, through his counsel, Hawes, filed in FQR a verified complaint

seeking, *in toto*, $2.5 million in compensatory and punitive damages, against Leiser,

individually, against his law firm, The Leiser Law Firm, PLLC, which, at that time, was known

as Leiser, Leiser & Hennessy, PLLC.  The lawsuit also named as defendants, Leiser's wife—an

employee of his law firm, and Thomas F. Hennessy, Esq., who was also an employee of Leiser's

law firm during the relevant time-frame.[3]  (Exhibit A, "FQR complaint").  The FQR complaint

asserted four causes of action: defamation *per se* (Count I); barratry and maintenance (Count II);

statutory civil conspiracy, in violation of VA. CODE ANN. § 8.01-499 and -500, as well as

common law conspiracy (Count III); and a claim for injunctive relief (Count IV).  Leiser's claim

for deprivation of his constitutional rights is limited to: (a) the trial court's adjudication (by

Judge #2) of his motion for sanctions against McCarthy and Hawes, or more precisely, its refusal

to adjudicate that motion and its granting, instead, of McCarthy's motion to strike Leiser's

sanctions motion pleadings; (b) its granting of Hawes' "notice of special appearance," whereby

he challenged the trial court's exercise of *in personam* jurisdiction over him; and (c) VSC's

subsequent refusal of Leiser's petition for appeal of the trial court's final order denying his

motion for sanctions against both McCarthy and Hawes.[4]

---

[3] Neither Karen A. Leiser, Esq., Leiser's wife, nor Hennessy, who was nonsuited by McCarthy as a party-defendant on 9/28/15, is a party to this lawsuit.

[4] An antecedent § 1983 lawsuit was filed by Leiser against Judge #1 who had initially been specially designated by VSC to preside over the FQR complaint, and who adjudicated Leiser's dispositive motions filed in response to that complaint.  EDVA dismissed that § 1983 case on grounds of judicial immunity, despite the fact that judicial immunity does not apply to declaratory relief—the only relief Leiser's § 1983 lawsuit requested.  (See fn. 27, *infra.*).  Leiser appealed that decision to USCA-4, which, on 10/24/16, dismissed the appeal as moot, after McCarthy suffered a voluntary nonsuit of his FQR complaint, pursuant to VA. CODE ANN. §

1. **The defamation *per se* claims  (Count I)**

Count I of McCarthy's FQR complaint asserted a cause of action of defamation *per se*, premised on Leiser's accusation that McCarthy had perjured himself while giving sworn testimony during court hearings in other cases.  From the face of McCarthy's FQR complaint, (**Ex. A**, pp. 18-21), it was apparent that Leiser's supposedly defamatory oral and written statements were alleged to have been published during:

(a) a hearing conducted in a Fauquier County General District Court ("FQR GDC") case, in which McCarthy and Leiser each represented adverse parties;  (**Ex. A**, ¶¶ 64-78);

(b) a hearing in a separate case in FQR Circuit Court ("FQR") in which Leiser and McCarthy each represented adverse parties; (**Ex. A**, ¶¶ 25, 47-49, 57-58);

(c) a hearing in the Circuit Court of Fairfax County ("FFX") related to an intentional tort lawsuit filed by Leiser that was then pending against McCarthy.  (**Ex. A**, ¶¶ 111-116);

(d) affidavits which had been executed by Leiser, Leiser's wife, and by Hennessy, and which Leiser sought to introduce into evidence during the course of the FQR GDC hearing referenced in (a), above; and which affidavits were also part of a pleading

---

8.01-380.  (*The Leiser Law Firm, PLLC, et. al. v. Hon. Gaylord L. Finch, Jr.*  (Record No. 16-1245)).  This subsequent § 1983 lawsuit is not an attempt to retry that first § 1983 case.  Upon his filing of that first § 1983 action, Leiser orally moved Judge #1 to recuse himself.  After McCarthy nonsuited his case against Leiser, Judge #1 granted that motion and recused himself from any further proceedings in the case, and VSC subsequently appointed Defendant, herein, The Honorable J. Martin Bass ("Judge #2") to replace him.  McCarthy's nonsuit, pursuant to VA. CODE ANN. § 8.01-380, did not terminate the litigation surrounding Leiser's motion for sanctions. Thus, the sole remaining task for Judge #2 was to adjudicate Leiser's motion for sanctions against McCarthy, McCarthy's cross-motion for sanctions against Leiser, and various procedural motions filed by McCarthy in defense against Leiser's motion for sanctions.  Finally, it also fell upon Judge #2 to adjudicate Hawes' "Notice of Special Appearance," by which he challenged the trial court's exercise of *in personam* jurisdiction over him.  It is the rulings of Judge #2, embodied in his final order, that are at issue in this case.  But a detailed understanding of McCarthy's claims, Leiser's defenses thereto, and the trial court's disposition (by Judge #1) of those claims and defenses, provides important background for this Court's adjudication of this case, concerning the rulings of Judge #2.

filed in FQR, related to (b), above; (**Ex. A**, ¶¶ 117-118);

(e) a petition for appeal from the final order entered in (b), above, which was filed by Leiser with VSC. (**Ex. A**, ¶¶ 101-102, and fn4).[5]

## 2. The Barratry Claims (Count II)

Count II of McCarthy's complaint (**Ex. A**, pp. 21-24) asserted against Leiser a claim of "barratry and maintenance" (hereinafter, "barratry"), in violation of VA. CODE ANN. § 18.2-451, and "Statute 8 Eliz. c. 2, as adopted in [VA. CODE ANN.] §§ 1-200 and -201."[6] The factual bases for his barratry claim consisted in Leiser filing against McCarthy:[7]

(a) a breach of written contract complaint in FFX that survived McCarthy's demurrer, only to be non-suited prior to trial (CL 2010-1888);

(b) the re-filing of that previously non-suited breach of contract complaint (CL 2012-05790), which survived in-tact, at least eight pre-trial dispositive motions argued by McCarthy, who was represented by Hawes, including a demurrer, five pleas in bar, a motion to dismiss, and a motion for summary judgment. The case was ultimately tried to a jury, which rendered a verdict for Leiser which was reduced to a final judgment awarding himi 100% of the more than $30,000 in damages/costs prayed for in his *ad damnum* clause;

(c) a ten-count intentional tort lawsuit in FFX, which survived McCarthy's demurrer—as to

---

[5] Also at issue in McCarthy's FQR complaint were similar allegedly defamatory statements published in a letter written by Leiser to the Virginia State Bar ("VASB"). Because those statements were subject to a qualified—as opposed to an absolute—privilege, that claim was *not* the subject of Leiser's dispositive motions or his motion for sanctions that is the subject of this lawsuit, and therefore, Leiser's letter to the VASB has no relevance to this lawsuit.

[6] Leiser merely restates the authority that McCarthy relied upon in support of his barratry claim, but does not concede that the cited authority supports a civil *private* right of action for barratry. The barratry statutes cited above provide that only the Commonwealth Attorney or the Attorney General may prosecute the crime of barratry and/or seek civil injunctive relief.

[7] See **Ex. A**, ¶¶ 14, 20-24, 143-165. See also, **Ex. C** (6/23/14 TR.) at 54:3-57:18; 75:5-7; **Ex. D** (11/12/14 TR.) at 32:12-21; 34:21-36:17; 48:22-50:9.

9 of the 10 counts asserted against him, and which Leiser ultimately non-suited (CL 2009-03014);

(d) the re-filing of that tort lawsuit (CL 2011-14432), which survived McCarthy's five distinct dispositive motions, but which ultimately, after a multi-day trial, resulted in a jury's defense verdict for McCarthy;

(e) a motion for sanctions filed by Leiser against McCarthy, in an earlier FQR intentional tort lawsuit filed by McCarthy, on behalf of his wife, and against a CA resident, Lewis, whom Leiser represented.

### 3. The Civil Conspiracy Claims (Count III)

Count III of McCarthy's FQR complaint asserted a civil conspiracy claim. (**Ex. A, ¶¶ 166-173**). McCarthy alleged that Phillip Leiser conspired with his law firm and his wife, an employee of that firm, as well as another employee, Hennessy, to injure McCarthy in his trade, business, or profession, in violation of VA. CODE ANN. §§ 18.2-499 and -500. His complaint further alleged that, as a result of their "partnership," Phillip and Karen Leiser, along with Hennessy, were all vicariously liable for each other's alleged intentionally tortious misconduct, on a theory of derivative and joint and several liability, notwithstanding that, as a legal and factual matter, Karen Leiser and Hennessy were—and always had been—Leiser's employees at the time Leiser published the allegedly false and defamatory statements about McCarthy. Thus, McCarthy sought to invoke a non-existent doctrine of *respondeat inferior*, whereby he sought to hold Leiser's employees/agents liable for the alleged tortious misconduct of Leiser, their employer/principal. Moreover, The Leiser Law Firm, PLLC had never been organized as a partnership. It had always been organized as a PLLC, with Phillip Leiser serving as its sole member/manager and owner, and McCarthy, a former "limited partner" of Leiser's firm, had

actual knowledge of the organization of that entity before he filed the FQR complaint.

## 4. Prayer for Injunctive Relief (Count IV)

Count IV of McCarthy's FQR complaint sought injunctive relief, to *permanently enjoin* Leiser, his wife, his former partner, and his law firm, from "filing, maintaining, or promoting lawsuits against [McCarthy], and from making *any statements* regarding McCarthy *to any other person;* and . . . [ordering them to] cause apologies to be transmitted to the courts . . . ." (emphasis added). (**Ex. A**, pp. 25-26).

### B. Leiser's pleadings filed in response to McCarthy's complaint

Leiser timely filed his responsive pleadings, including a plea in bar and demurrers.[8] (**Ex. B**). On 6/23/14 the trial court conducted a hearing on Leiser's demurrers and plea in bar.

### 1. Demurrers to defamation claim

Leiser's demurrers to the defamation claims relied upon the absolute privilege afforded statements made during the course of, or in relation to judicial proceedings.[9] For that well-settled principle, Leiser cited to a long line of cases dating back more than a century.[10]

### 2. Demurrers to barratry claim

As to the barratry claim, Leiser argued that no such private right of action exists.[11] The

---

[8] Hennessy had filed a much more detailed memorandum of law in support of his separately-filed demurrer, which, by a 5/4/15 order of the trial court, was deemed to have been filed and argued by Leiser, as well.

[9] **Ex. B**, ¶¶ 8, 12.

[10] He cited to *Mansfield v. Bernabei,* 727 S.E.2d 69, 73 (2012); *Isle of Wight County v. Nogeic*, 704 S.E.2d 83, 88 (2011); *Lindeman v. Lesnick*, 604 S.E.2d 55, 58 (2004); *Titan America L.L.C. v. Riverton Inv. Corp.,* 569 S.E.2d 57, 66 (2002); *Lockheed Information Management Systems Co. v. Maximus, Inc.*, 524 S.E.2d 420, 424-25 (2000); *Donohoe Constr. Co. v. Mt. Vernon Assocs.,* 369 S.E.2d 857, 860 (1988); *Watt v. McKelvie,* 248 S.E.2d 826, 829 (1978); *Darnell v. Davis,* 58 S.E.2d 68, 70 (1950); *Massey v. Jones*, 28 S.E.2d 623 (1944); *Penick v. Ratcliffe,* 140 S.E. 664 (1927); and *Spenser v. Looney*, 82 S.E. 745, 747 (1914).

[11] **Ex. B**, ¶¶ 25-26.

statutes proscribing barratry are criminal statutes which can be enforced by either the Commonwealth Attorney or Virginia's Attorney General. VA. CODE ANN. §§ 18.2-451 through -455. But none of those statutes authorizes a private right of action, and there is not a single decision by VSC that would even suggest such a private right of action is or ever has been cognizable in Virginia. Moreover, in the absence of any decision on the subject by VSC, Leiser cited to a North Carolina appellate opinion, *Daimler Chrysler Corp. v. Kirkhart*, 561 S.E.2d 276 (NC 2002), which extensively discussed and ultimately rejected a civil claim for barratry, noting that no such private right of action existed at common law in England.[12]

### 3. Demurrer to civil conspiracy claims

In response to McCarthy's conspiracy claim (Count III) (**Ex. A**, pp. 24-25), Leiser's demurrer argued the legal defense of intra-corporate immunity.[13] McCarthy's complaint had expressly alleged that Phillip and Karen Leiser, along with Hennessy, had formed a legal partnership,[14] notwithstanding the organization of the firm as a single-member/manager PLLC, of which Phillip Leiser was and always had been the sole owner, and of which Karen Leiser and Hennessy had always been regular W-2 employees. And since a principal and his agent are not separate persons for purposes of the conspiracy statute, it was a legal impossibility for any of the

---

[12] Even in some alternative universe that recognizes a private right of action for barratry, there would have been no good faith basis for McCarthy's barratry claim against Leiser, which related to Leiser's two non-suited complaints against McCarthy which had withstood his dispositive motions, along with the re-filed incarnations of those two lawsuits, each of which survived multiple dispositive motions filed by McCarthy, and were ultimately decided by juries after multi-day trials. And one of those complaints resulted in a verdict and final judgment for Leiser. Nor was Leiser's earlier motion for sanctions, filed in a previous and unrelated FQR case, the proper subject of McCarthy's barratry claim. Although it did not grant that earlier motion for sanctions filed by Leiser, FQR declined McCarthy's motion to impose sanctions against Leiser for filing that earlier motion for sanctions against McCarthy, expressly finding that Leiser had asserted a colorable claim for sanctions.

[13] **Ex. B**, ¶ (27).

[14] **Ex. A**, ¶¶ 6, 11-17, 20, 117-119.

defendants to be found liable for civil conspiracy.  *Nedrich v. Jones*, 429 S.E.2d 201, 205 (1996).

### 4.  Demurrer to prayer for injunctive relief

Finally, Leiser's opposition to McCarthy's request for injunctive relief (Count IV) **(Ex. A**, pp. 25-26) was grounded in his alternative arguments, both well supported by controlling legal authority, that the injunction McCarthy sought would constitute an unconstitutional prior restraint on speech that was *way* overbroad; and, as a matter of law, McCarthy *had* an adequate remedy at law—the availability of a suit for damages for any speculative future actionable defamatory speech.  (**Ex. B**, ¶ 28).

### C.  The trial court's resolution of Leiser's dispositive motions

On 6/23/14 Judge #1 proceeded to adjudicate Leiser's dispositive motions.  He overruled Leiser's demurrers and plea in bar to Counts I and III—defamation *per se* and civil conspiracy, respectively.  He sustained the demurrer to Count IV seeking injunctive relief, albeit, without prejudice and with leave to amend.  And finally, he reserved his ruling as to Leiser's demurrer to Count II, the barratry claim.  (**Ex. C** at 59:20-60:2).

On 11/12/14, after a hearing on Leiser's motion to reconsider ("MTR"), Judge #1 verbally denied it.[15]  Although he acknowledged the barratry claim was an issue of first impression for him, prior to issuing his bench ruling overruling Leiser's demurrer to that claim, he admitted he had not read the barratry statutes, VA. CODE ANN. §§ 18.2-451-455, or the North Carolina appellate decision, *Daimler Chrysler* (cited at pp. 11, *supra.*), which, in the absence of any Virginia precedents, was cited and argued by Leiser as persuasive authority supporting his argument that the trial court should reject McCarthy's invitation to recognize a

---

[15] He did not enter a written order reflecting that ruling until 5/4/15.

private right of action for barratry.[16]  In a colloquy with counsel at the 6/23/14 hearing on

Leiser's demurrers and plea in bar, Judge #1 proclaimed,

> **Mr. Hennessy**:  Just to clarify, Your Honor, I understood that on the barratry claim, you reserved—**The Court**:  I did. . . . I'm just not sure how I'm going to rule on that one.  I've never had it come up in 32 years on the bench.  So there's a first time for everything.  (**Ex. C** at 79:6-18).

Nearly five months later, on 11/12/14, when the parties returned to court to argue Leiser's

MTR, Judge #1 confirmed the issue was one of first impression for him and admitted he had not

read either the relevant statutes or the NC appellate decision cited by Leiser in support of his

demurrer.[17]

### D.  The Motion for Sanctions that is the Subject of This § 1983 Action

#### 1.  Part 1 (Judge #1)

Leiser's responsive pleading filed on 10/11/13 included a motion for sanctions.  (**Ex. B**).  The

motion itself was fairly skeletal in nature, and named as a respondent, only McCarthy, but not

Hawes.  At the 6/23/14 hearing, Judge #1 deferred ruling on Leiser's motion for sanctions, which

was premised on, *inter alia*, the absolute privilege afforded his statements made during the

course of judicial proceedings.  The motion asserted that the mere filing of the state court lawsuit

was improper and sanctionable because the conduct complained of was not actionable, as a

matter of law.  (See also, **Ex. C** at 75:14-76:19).  But without explanation, Judge #1 deemed that

motion "premature."  *Id.* at 74:5-15.  As a consequence, he removed the sanctions motion from

the docket, but expressly stated he was not denying the motion.  *Id.* at 89:13-90:3.[18]

---

[16] See. *e.g.*, **Ex. C** at 57:19-59:19.
[17] **Ex. D** at 55:3-13; 61:17-62:4; 64:2-67:16.
[18] Judge #1's 6/23/14 order (**Ex. F**) states that the trial court found Leiser's motion for sanctions "premature," and ordered that motion "removed from the docket but *not* dismissed."  (emphasis in original).

After the 11/12/14 hearing on Leiser's MTR, Judge #1 declined to enter any orders that day concerning any of his bench rulings, deferring entry until the parties returned to court on 5/4/15. At the 5/4/15 hearing, McCarthy's counsel, Hawes, misrepresented that at the previous 11/12/14 hearing, the trial court had deemed Leiser's motion for sanctions premature and "denied [it] without prejudice."[19] Leiser disputed that characterization, and specifically inquired whether he would have to re-file his motion for sanctions. Judge #1 expressly reaffirmed that Leiser's motion would not have to be re-filed, to which Leiser responded, "Okay. As long as [the motion is] still there." (**Ex. G** (5/4/15 TR.) at 6:5-20). Yet, contrary to his verbal assurance, the order entered that day stated at ¶ 4, "[Leiser's] motion for sanctions, prematurely filed, be and hereby is, denied without prejudice;" (**Ex. H**).

Thus, without ever conducting a hearing on Leiser's motion for sanctions, Judge #1 purported to deny that motion, albeit without prejudice. But on 5/4/15 there was no legitimate basis upon which to either deny or dismiss the motion, in light of the court's 6/23/14 order, which (erroneously) deemed Leiser's motion for sanctions to have been "prematurely" filed, and which Judge #1 ordered removed from the docket, but *not* dismissed. Nothing changed between 6/23/14 and 5/4/15 that justified that new disposition, whereby he denied the motion without prejudice. (See fn. 18).

On 9/28/15, at the conclusion of a hearing concerning other matters, the Court entered an order granting Hawes' oral motion for leave to withdraw as counsel. (**Ex. I**). Leiser voiced his objection, stating,

> Oh, and one thing, your Honor, with respect to the motion to
> withdraw. I mean, obviously the Court granted it, but the only

---

[19] The only reference made to Leiser's motion for sanctions at the 11/12/14 hearing on his MTR, was a statement by Judge #1 made merely in passing, that he thought the sanctions motion was still premature. (**Ex. D** at 58:12-13).

thing I would say is that I still intend to preserve my right to pursue the sanctions. And so you might have to— **The court:** I withheld a ruling on that. **Leiser:** Right. So that's still in play. **The court:** It is. **Leiser:** (to Hawes) So you might have to come back and— **The court:** That's in the order of [5/4/15], I think. (**Ex. J** (9/28/15 TR.) at 21:15-22:4).

Proceeding, *pro se*, McCarthy elected to suffer a voluntary nonsuit of his case during a 2/10/16 hearing, and the court entered an appropriate order. (**Ex. K**). Based on all of the foregoing circumstances, Leiser reasonably believed that the motion for sanctions he had filed nearly 2.5 years earlier, and which had never been heard, was still pending. From the 9/28/15 colloquy quoted above, it is clear the court thought so, as well. Of course, courts speak through their written orders, and the court had, in fact, on 5/4/15, purported to deny Leiser's motion for sanctions—concerning which it had refused to conduct a hearing—after expressly confirming at least three times, that Leiser would *not* have to refile it.

At the 2/10/16 hearing, prior to the court's entry of the nonsuit order, Leiser raised his concern about the status of his previously filed sanctions motion. He argued,

> There is no basis whatsoever for this Court to dismiss a motion for sanctions that this Court would not hear. Because remember, I had scheduled this for a hearing or tried to schedule it for a hearing. This Court declined and said, ["]no, it's not ripe yet.["] Well, the fact is the motion for sanctions became ripe as soon as the complaint was filed. The complaint is and always has been frivolous. (**Ex. E** at 17:17-18:2. See also, 19:6-22).

> . . . [A] nonsuit does not get rid of a pending motion for sanctions. That is clear. . . . but here's the thing. Mr. McCarthy is asking you to dismiss a motion without even a hearing on that motion. That is improper. I am entitled to an opportunity to be heard on that motion for sanctions, as to why his pleadings were frivolous, *ab initio*, when they were filed. And he knew they were frivolous, and he was informed *ad nauseum* by another judge in this jurisdiction for doing the same exact thing. *Id.* at 23:9-24:13.

> . . . But the motion for sanctions was filed. This Court had entered an order saying it is not dismissed. It will remain pending. He

wants to nonsuit?  Let's get that nonsuit entered, but that does not make that motion for sanctions go away.  *Id.* at 24:19-25:2. . . . I have the right to vindicate my rights not to be harassed by frivolous litigation.  And I will have that right; I will have the opportunity to be heard on that issue.  That is clear.  *Id.* at 25:19-22.

Judge #1 agreed, engaging in the following colloquy with Leiser,

> **The court:**  . . . I'll go ahead and endorse the nonsuit order.  And then I'll give you a hearing on the sanctions matter. . . .  **Leiser:** Are you saying then, that the Court is going to conduct the sanctions hearing?  **The court:**  That would be my intent, uhm-hm.  *Id.* at 26:13-20.

Consistent with that clear expression of its intent, the trial court (Judge #1) then entered McCarthy's nonsuit order (**Ex. K**), along with a separate scheduling order (**Ex. L**), setting a date-certain "for a contested hearing on Leiser's motion for sanctions against McCarthy *and* Hawes." *Id.* (emphasis in original).  Two weeks later, on 2/24/16, the court entered a suspending order (**Ex. M**) which reads,

> . . . WHEREAS, it is this Court's specific intent to afford [Leiser] the opportunity to be heard concerning [the] pending motion for sanctions against [McCarthy] and his former counsel of record, . . . Hawes; WHEREAS, on [2/10/16] this Court scheduled Leiser's motion for sanctions for a full-day hearing on 4/7/16 . . . ; WHEREAS, the Court needs sufficient time to consider the arguments of the parties and to render its decision on [Leiser's] motion for sanctions; IT IS HEREBY . . . ORDERED that . . . the entry of the non-suit order is hereby suspended until further order of this Court, and shall become a final order only after more than [21] days have elapsed from the entry of an order by this Court disposing of the merits of Leiser's motion for sanctions against McCarthy and Hawes.  (**Ex. M**).

On 4/7/16, Leiser and McCarthy appeared for the previously scheduled hearing on Leiser's motion for sanctions.  Preliminarily, they argued to the court the implications of the inconsistency between its 6/23/14 and 5/4/15 orders—the former removing from the docket but not dismissing Leiser's sanctions motion, but the latter *denying* that motion, without prejudice,

16

but without a hearing.  And, as he had consistently done at the hearings held on 6/23/14,

11/12/14, 5/4/15, 9/28/15, and 2/10/16, at the 4/7/16 hearing, Leiser again voiced his insistence

that he be heard on his motion for sanctions.  But Judge #1 declined to address that issue or to

conduct the sanctions hearing that day.  Instead, by written order dated 4/7/16 (**Ex. N**), he

recused himself from any further proceedings in the case.[20]

### 2. Motion for sanctions (Part II) (out in the wilderness)

By now, Leiser realized that his motion for sanctions had in fact been improperly "denied" by

Judge #1, without a hearing, and contrary to his repeated assurances that the motion for sanctions

remained pending and did not need to be refiled.  Leiser also realized that his originally-filed

motion for sanctions did not name Hawes as a respondent.  Therefore, on 5/31/16, consistent

with the 2/10/16 and 2/24/16 orders (**Exs. L, M**) entered by Judge #1, and in order to address not

only the sanctionable complaint that initiated the lawsuit, but also to include additional

sanctionable misconduct engaged in by McCarthy and Hawes throughout their 2.5 year

prosecution of that lawsuit, Leiser filed a motion for sanctions, a memorandum of law in support

thereof, along with an exhibit binder.  (**Exhibits O, P, and Q**).  Leiser's

motion/memorandum/exhibit book contained every fact, legal authority, argument, and exhibit

he intended to present at the hearing, whenever that might occur.  But because his memorandum

of law exceeded the 20 pg. limit imposed by VA. R. S. Ct. 4:15(d), he filed, contemporaneously

with those pleadings, a motion for leave of court to file a memorandum of law exceeding that

page limit.  (**Ex. R**).[21]  McCarthy and Hawes were properly served with all of those filings that

---

[20] Upon his filing of that first § 1983 action, Leiser orally moved Judge #1 to recuse himself.
After McCarthy nonsuited his case against Leiser, Judge #1 granted that motion and recused
himself from any further proceedings in the case.
[21] There was no judge from whom to seek permission at that time, as all of the FQR judges had
recused themselves (**Ex. S**), as had Judge #1 (**Ex. N**), and VSC had not yet specially designated a

day, Hawes having been personally served by private process service.  **(Ex. T)**.

### 3.  Motion for Sanctions (Part III) (Judge #2)

On 6/10/16, more than two months after Judge #1 recused himself, VSC specially designated Judge #2 (The Honorable J. Martin Bass) to replace him.  The sole remaining task for Judge #2 was to adjudicate Leiser's motion for sanctions against McCarthy, McCarthy's cross-motion for sanctions against Leiser, and various procedural motions filed by McCarthy seeking dismissal of Leiser's motion for sanctions.[22]  Finally, it also fell upon Judge #2 to adjudicate Hawes' "Notice of Special Appearance," by which he challenged the trial court's exercise of *in personam* jurisdiction over him.  **(Ex. AA)**.

On 8/16/16, Judge #2 scheduled a hearing **(Ex. BB)** to commence on 10/13/16 for Leiser's motion for sanctions, as well as the other motions that had been filed by McCarthy, including a cross-motion for sanctions against Leiser.  At that point, McCarthy and Hawes had had 4.5 months to digest Leiser's motion, memorandum, and exhibits, and to ruminate over their defenses thereto.  But Judge #2 refused to conduct a hearing on Leiser's motion for sanctions, and instead, granted McCarthy's motion to strike Leiser's sanctions pleadings; denied Leiser's oral motion to keep the case open and allow him to refile those pleadings, and ruled in favor of

---

judge to replace him.  When, after nearly two months had elapsed without the designation of a new judge by VSC, Leiser concluded that McCarthy and Hawes should be afforded as much advanced notice as possible, of the precise nature of his claim for sanctions.  For that reason, Leiser filed and served his motion and related pleadings on 5/31/16, 4.5 months before the 10/13/16 hearing on that motion, believing he would obtain permission, after the fact, to file a memorandum of law exceeding, by one page, the twenty-page limit for filing a memorandum of law without leave of court.  That one extra page consisted of the certificate of service.

[22] On 2/8/16 McCarthy filed a "motion to dismiss [Leiser's] motion for sanctions."  **(Ex. U)**.  On 2/11/16 he filed an "Objection to suspending order and . . . motion to remove sanctions motion from docket."  **(Ex. V)**.  On 8/1/16 he filed a "motion for leave to withdraw voluntary nonsuit [and] motion to vacate nonsuit order."  **(Ex. W)**, to which Leiser filed a response on 8/4/16.  **(Ex. X)**.  That same day, McCarthy filed a "motion to strike [Leiser's motion for sanctions, and related pleadings]" **(Ex. Y)**, to which Leiser filed a response in opposition on 8/8/16.  **(Ex. Z)**.

Hawes on his "Praecipe and Notice of Special Appearance" (**Ex. AA**), which he had filed the day before the 10/13/16 hearing, a copy of which he first gave to Leiser when he walked into court on the day of the hearing. Judge #2 adopted Hawes' argument that the trial court could not exercise *in personam* jurisdiction over Hawes, who, on 9/28/15, had withdrawn as counsel of record for McCarthy, before Leiser had filed his most recent 5/31/16 sanctions motion and related pleadings. It is the 11/1/16 order encapsulating those rulings of Judge #2 that is the subject of this § 1983 action. (**Ex. CC**).[23]

> **(a) Judge #2 sustained McCarthy's motion to strike Leiser's sanctions motion pleadings and denied Leiser's oral motion to grant him leave to re-file his sanctions motion pleadings**

In support of his motion to strike Leiser's sanctions pleadings, McCarthy advanced the hyper-technical argument that, in one of two references in the 2/24/16 suspending order (**Ex. M**), the trial court expressed its specific intent to conduct a hearing on Leiser's "pending" motion for sanctions against McCarthy and Hawes."[24] McCarthy correctly observed that Leiser's motion for sanctions was technically no longer "pending" at the time the suspending order was entered on 2/24/16, because the trial court had initially, on 6/23/14, ruled that the motion was "premature," and deemed it "removed it from the docket, but *not* dismissed." (**Ex. F**). (emphasis in original). But on 5/4/15 it entered formal orders to reduce its 11/12/14 rulings to

---

[23] See also, (**Ex. DD**), the complete transcript of the 10/13/16 hearing presided over by Judge #2.

[24] Compare (**Ex. L**), the 2/10/16 order scheduling "a contested hearing on Leiser's motion for sanctions against McCarthy *and* Hawes . . . ." (emphasis in original), with the last ¶ of (**Ex. M**), the 2/24/16 suspending order, which suspended entry of the 2/10/16 non-suit order, and expressly stated that that nonsuit order "shall become a final order *only after* . . . the entry of an order disposing *of the merits* of Leiser's motion for sanctions *against McCarthy and Hawes.*" (emphasis added); and contrast that language with the third "WHEREAS" clause of that same suspending order, which states, "WHEREAS, it is this Court's specific intent to afford [Leiser] the opportunity to be heard concerning their pending motion for sanctions against [McCarthy] and . . . [Hawes]."

writing.[25]  At the 5/4/15 hearing, Hawes falsely represented to the court that at the 11/12/14 hearing it had denied Leiser's motion for sanctions, without prejudice.  The court agreed, despite the fact that the record of that hearing discloses that the only comment the court made was to reiterate, in passing, that it still thought Leiser's sanctions motion was "premature."  (**Ex. D** at 58:12-13).  Significantly, no order was entered that day (11/12/14) regarding that motion, which meant the court's earlier 6/23/14 disposition of that motion—which had been "removed from the docket but *not* dismissed," (emphasis in original)—was still controlling.

At the 5/4/15 hearing, when confronted with Hawes' mischaracterization of what the court had ruled at the 11/12/14 hearing, and the court's apparent adoption of that mischaracterization, Leiser asked if that meant that his motion was no longer pending.  The court replied, "No."  And when Leiser asked if he needed to refile it, the court responded, "No, you don't."  To which Leiser exclaimed, "Okay.  As long as it's still there."  (**Ex. G** at 6:5-20).  But despite the court's reassurances that day, and despite the fact that no hearing was ever conducted on Leiser's motion, the court inexplicably entered an order which purported to deny Leiser's motion for sanctions, without prejudice.

At the 10/13/16 hearing on their cross-motions for sanctions, McCarthy pounced on the single instance of Judge #1's inclusion of the modifier, "pending," in his 2/24/16 suspending order (**Ex. M**), to describe Leiser's motion for sanctions, and Judge #2 followed suit, adopting McCarthy's argument that, because the 2/24/16 order purported to suspend the entry of the nonsuit for the sole purpose of conducting a hearing on what it erroneously characterized as a "pending" motion for sanctions against McCarthy and Hawes, and because no such motion was technically "pending" at the time the suspending order had been entered, that order was thereby

---

[25] The 11/12/14 hearing was on Leiser's motion to reconsider the court's 6/23/14 orders overruling Leiser's demurrer and plea in bar.

rendered meaningless, and the court was compelled to treat it as if it didn't exist.  In addition,

McCarthy argued, and the trial court agreed, that since Leiser's memorandum of law exceeded

the twenty page limit imposed by Rule 4:15(d), he needed leave of court to file it, which he had

not obtained at the time he did so.  (See § IV(D)(2), *supra.*).  And since he had not been granted

such leave at the time the suspending order was entered, his sanctions motion and memorandum

of law, filed on 5/31/16, subsequent to the entry of that 2/24/16 suspending order, was not

"pending" at the time the order was entered, and was therefore not the proper subject of the

suspending order.  (**Ex. CC** at p. 1).  Judge #2 denied Leiser's oral motion to keep the case open

and to grant him permission to file his 5/31/16 pleadings.

### (b) Judge #2 concluded that the trial court could not exercise *in personam* jurisdiction over Hawes

Although he had been personally served with Leiser's sanctions motion and

accompanying pleadings and exhibits on 5/31/16 (**Ex. T**), Hawes waited until the day before the

scheduled 10/13/16 hearing to file a "Notice of Special Appearance," (**Ex. AA**)[26] which argued

that the trial court could not exercise *in personam* jurisdiction over Hawes, for the simple reason

that he had withdrawn as counsel of record in the case.  The court agreed with that analysis and

concluded it could not exercise *in personam* jurisdiction over Hawes, despite its status as a court

of general jurisdiction; and despite the fact that the complaint that was the subject of Leiser's

sanctions motion had been signed and filed by Hawes, who, on behalf of his client, McCarthy,

had litigated the action initiated by that complaint for about two years, *in that very court*; and

despite Hawes' residence, the location of his law office, and his frequent practice of law in FQR;

and despite timely and proper service of the sanctions pleadings upon him in FQR, 4.5 months

---

[26] Hawes waited until Leiser walked into court for the hearing on 10/13/16 to serve Leiser with that Notice.  (**Ex. DD** at 27:22-28:11).

prior to the hearing date; and despite his attendance in court that morning.  So much for the long arm of the law; the trial court amputated it at the shoulder.

### (c)  Motion to Reconsider (MTR)

Under VA. R. S. Ct 1:1, Leiser timely filed an MTR (**Ex. EE**) as to Judge #2's 11/1/16 order (**Ex. CC**), as well as a proposed suspending order (**Ex. FF**), and a letter informing Judge #2 of his Rule 1:1 deadline to take action while his court still retained subject matter jurisdiction (SMJ) over the case.  (**Ex. GG**).  Judge #2 took no action regarding the proposed suspending order or Leiser's MTR, and simply allowed twenty-one days to pass from the date of entry of his 11/1/16 order, thereby losing subject matter jurisdiction over the case, and thereby, effectively issuing a pocket veto of Leiser's MTR.

### E.  Appellate Court Proceedings Related to the Motion for Sanctions

Leiser timely noted his appeal (**Ex. HH**) and properly perfected that appeal to VSC, by timely filing a Petition for Appeal (**Ex. II**).  On 5/19/17 he was given a hearing before a three-Justice writ panel as to why VSC should grant his petition for appeal.  On 7/17/17 VSC refused Leiser's petition for appeal (**Ex. JJ**).  He timely filed a petition for rehearing (**Ex. KK**) but on 10/23/17 VSC denied that petition.  (**Ex. LL**).  On 1/23/18 Leiser timely filed a Petition for a writ of *certiorari* with SCOTUS, which, at the time of filing the Complaint that initiated this action, was still considering that petition.  (**Ex. MM**).

## V.    STATEMENT OF FACTS

### A.  McCarthy's motion to strike Leiser's motion for sanctions

1. In light of the facts described in Part IV(A), *supra*, Leiser had a good faith basis for filing a motion for sanctions based upon the frivolous nature of the FQR complaint, itself.

2. A trial court's imposition of sanctions is compulsory when a litigant and/or his counsel has

violated any of the three prongs of the sanctions statute.  VA. CODE ANN. § 8.01-271.1.  See also, *Northern Virginia Real Estate, Inc. v. Martins*, 720 S.E.2d 121, 130 (2012); *Ford Motor Co. v. Benitez*, 639 S.E.2d 203, 206 (2007).

3. There was nothing "premature" about the filing of Leiser's motion for sanctions, as it was based upon the FQR complaint, itself, which sought damages for absolutely protected speech, and which asserted a cause of action (barratry) that did not exist, and failed to even attempt to argue that the law *should* be changed; but instead, falsely argued that the current state of the law allowed for a private right of action for barratry, something contradicted by the text of the barratry statutes themselves, the absence of any supporting precedents, and the reasoning of the N.C. appellate court decision cited extensively by Leiser in his demurrer. (See p. 11, *supra.*).  (**Ex. DD** at 53:21-57:14).

4. Judge #1 had no basis upon which to deny Leiser's motion for sanctions on 5/4/15, since nothing had changed between 6/23/14—when he removed it from the docket but *did not* dismiss it—and 5/4/15, his only additional comment on the subject, occurring on 11/12/14, when he stated, in passing, that he thought the sanctions motion was premature.  (**Ex. D** at 58:12-13).

5. From the facts that were related to Judge #2 in the various pleadings he reviewed and at the *ore tenus* hearing over which he presided on 10/13/16 (See **Ex. DD**), he should have and presumably did understand that Leiser had been deprived of his opportunity to be heard on his motion for sanctions through no fault of his own.

6. After Judge #2 was substituted by VSC for Judge #1, Judge #2 essentially stepped into the shoes of Judge #1, with respect to any of his orders that were still subject to the court's power to modify or clarify.

7. In particular, the 2/24/16 suspending order, with its single erroneous reference to "the pending" motion for sanctions, was still subject to the trial court's discretion to modify, for the purpose of clarifying the order so that its terms were consistent with the clear intent, as expressed on multiple occasions by Judge #1, to conduct a hearing on Leiser's motion for sanctions.[27]

8. Judge #2 could have easily simply stricken the single instance of the word, "pending" from the 2/24/16 suspending order. Unquestionably, that would have fulfilled the intent of Judge #1 to conduct a hearing on Leiser's motion for sanctions against McCarthy and Hawes.[28]

9. Judge #2 could also have granted Leiser's oral motion that he be given leave of court, retroactively, to file his 5/31/16 motion and memorandum of law—the latter exceeding the 20-page limit by one page, or, in the alternative, to keep the case open and allow him to re-file his pleadings. (**Ex. DD** at 20:6-25:2; 40:8-42:10; 42:18-21; 43:4-5; 46:15-48:3).

10. Judge #2 could have deemed Leiser's 5/31/16 sanctions motion to constitute an amendment to his initially-filed 10/11/13 motion for sanctions, under VA. R. S. Ct. 1:8, which states, "Leave to amend shall be liberally granted, in furtherance of the ends of justice." See also *Mortarino v. Consultant Engineering Services, Inc.*, 467 S.E.2d 778 (1996).

11. Any of those orders described above would have been consistent with the intent of Judge #1 as repeatedly expressed by him during the course of the nearly two years in which he had

---

[27] Expressions of the intent of Judge #1 to conduct a hearing on Leiser's motion for sanctions can be found, generally, at Part V(D)(1), *supra*, and in particular at: **Ex. C** at 74:5-15; 89:13-90:3; **Ex. D** at 58:12-13; **Ex. E** at 26:13-20; **Ex. F; Ex. G** at 6:5-20; **Ex. H; Ex. J** at 21:15-22:4; **Ex. L**; and **Ex. M**, which expressly suspended the nonsuit order until after the court disposes of the merits of Leiser's motion for sanctions against McCarthy and Hawes.

[28] Judge #1, who had presided over the case, *ab initio*, should have been deemed to know what orders he had entered in the case. Therefore, from the fact that he referred to a "pending" motion for sanctions in the suspending order, despite the fact that none was pending, it must be inferred that he was mistaken as to his view that Leiser's sanctions motion was still pending. Thus, a simple omission of the word, "pending" would have made the suspending order make sense.

presided over the case—from—(at the latest) 6/23/14, to 4/7/16.

12. Instead, Judge #2 chose to interpret the words, "the pending motion for sanctions," literally, and in such a way as to render the 2/24/16 suspending order meaningless and absurd, since there was (through no fault of Leiser's, but rather, through the arbitrary action of Judge #1, who denied it without prejudice and without a hearing) no "pending" motion for sanctions, and thus the suspending order indicated the final order was being suspended in order to allow the court to conduct a hearing on a non-existent motion. (**Ex. DD** at 6:22-13:1).

13. Familiar canons of construction require courts to ascribe the plain meaning to words of a will, a contract, or a statute, unless doing so would render those provisions meaningless or absurd, or would clearly contradict the intent of the draftsman.[29]

---

[29] **Will construction:** *Huaman v. Aquino*, 630 S.E.2d 293, 296 (2006) ("The cardinal principle of will construction is that the intention of the testator controls."); *Osborne v. Cox*, 129 S.E. 347, 348 (1925) ("In the construction of wills it is a well settled rule that effect must be given to every word of the will, if any sensible meaning can be assigned to it not inconsistent with the general intention of the whole will[,] taken together. Words are not to be changed or rejected unless they manifestly conflict with the plain intention of the testator, or unless they are absurd . . . ."). (all internal citations omitted).

**Contract construction:** *Envtl. Staffing Acquisition Corp. v. B & R Const. Mgmt., Inc.,* 725 S.E.2d 550, 554 (2012) ("No word or clause in [a] contract will be treated as meaningless if a reasonable meaning can be given to it."); *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 557 S.E.2d 199, 201 (2002) ("We will not treat a contract provision as meaningless when a reasonable meaning can be given to it.") (all internal citations omitted).

**Statutory construction:** *Supinger v. Stakes*, 495 S.E.2d 813, 817 (1998) ("In applying the plain meaning rule, this Court constantly strives to determine and to give effect to the intention of the legislature."); *Pedersen v. City of Richmond*, 254 S.E.2d 95, 98 (1979); ("Indeed, where a statute can be made constitutional by a reasonable construction, courts are under a duty to give it that construction."); *Cummings v. Fulghum*, 540 S.E.2d 494, 496 (2001) ("We must determine the General Assembly's intent from the words appearing in the statute, unless a literal construction of the statute would yield an absurd result."); *Dowling v. Rowan*, 621 S.E.2d 397, 401 (2005) ("We are bound by the plain meaning of the words used [in a statute] 'unless a literal interpretation would result in a manifest absurdity.'"); *Evans v. Evans*, 695 S.E.2d 173, 176 (2010) ("We must give effect to the legislature's intention as expressed by the language used unless a literal interpretation of the language would result in a manifest absurdity. If a statute is

14. Thus, when a court is tasked with interpreting the writings *of others*, it does so by ascribing to the words used their plain meaning, *unless* doing so would yield an absurd result clearly not intended by the draftsman.

15. In stark deviation from those familiar canons of construction that apply to the interpretation of the writings of *others*, Judge #2 interpreted *his own court's writing*—its 2/24/16 suspending order (**Ex. M**)—in such a way as to render it meaningless, or absurd, by ascribing to it a meaning by which it purported to schedule a hearing on a non-existent motion for sanctions. (**Ex. DD** at 33:20-36:22).

16. Similarly, the interpretation adopted by Judge #2 also rendered the trial court's prior orders, embodied in **Exs. F, H,** and **L**, meaningless, as well, since his interpretation rendered Judge #1's earlier denial "without prejudice" of Leiser's initially-filed motion for sanctions a denial *with* prejudice, nullifying those orders and rendering the order embodied in **Ex. L** meaningless.

17. Judge #2 could have easily made a minor modification to the 2/24/16 suspending order that was still subject to his power to modify and clarify, in such a way as to preserve the meaning of four of the court's prior orders (**Exs. F, H, L**, and **M**), and in order to carry out the express intent of Judge #1, as expressed during multiple colloquies with counsel, and in the texts of those orders.

18. Instead, Judge #2 selected an interpretation which rendered his own court's prior orders meaningless, and deprived Leiser of any opportunity to be heard concerning a motion for

---

subject to more than one interpretation, we must apply the interpretation that will carry out the legislative intent behind the statute."). (all internal citations omitted).

sanctions that had been timely filed, properly scheduled, wrongly characterized as "premature," and wrongly denied *three times*.

19. Judge #2 selected an interpretation which deprived Leiser of the opportunity to expose a serious threat to the integrity of the justice system, as well as the opportunity to seek redress for being forced, for two-and-a-half years, to defend against an egregiously frivolous and vexatious lawsuit in a distant jurisdiction.

20. Although Virginia's sanctions statute, VA. CODE ANN. § 8.01-271.1, is intended to punish and deter attorneys and parties who compromise the integrity of the justice system, it also serves as a vehicle by which the victims of vexatious lawsuits can seek redress, in the form of an order awarding them costs, attorney's fees, and punitive sanctions.

21. Thus, the sanctions statute itself creates a property right in those who use it to vindicate their rights, in much the same way as a common law tort claim constitutes a recognized property right in Virginia. *Huaman v. Aquino*, 630 S.E.2d 293 (2006).

22. Through his 11/1/16 order (**Ex. CC**), Judge #2 deprived Leiser of his substantive right to seek the protection, vindication, and compensation provided by the sanctions statute.

23. Procedural due process of law requires government decision-makers engaged in decision-making of a judicial nature, to articulate the legal and factual bases for their decisions that are dispositive of a litigant's claim.

24. Judge #2 failed to cite to any legal authority that would support his decision to grant the motion to strike, based upon his application of the "plain meaning" rule, under the circumstances of this case.

25. In light of the reasonable alternative explanation—that the word, "pending," was *mistakenly*— because erroneously—employed, to describe a motion that *should still have been pending*, but

which, Judge #1 had wrongly denied without prejudice, and which he expected Leiser would modify or amend, or simply file anew, and which would then name *both* McCarthy *and* Hawes as respondents—which would provide Leiser with an opportunity to be heard on a motion of which McCarthy and Hawes had been on notice since 10/11/13, the decision by Judge #2 to deny that hearing was unconstitutional.

26. Particularly in light of the absence of any unfair surprise, given that both McCarthy and *Hawes* had been in possession of Leiser's motion and related pleadings for 4.5 months, providing Leiser a hearing was not merely a constitutionally acceptable outcome, it was *the only* constitutional, and therefore, the only permissible outcome.

   **B. Hawes' "Notice of Special Appearance"**

27. An inquiry concerning whether a court may exercise *in personam* jurisdiction turns on the "minimum contacts" between the State and the person as well as the status of the court, itself—as a court of either limited or else general jurisdiction.

28. In this instance, Hawes is: (a) a VA-licensed attorney; (b) who lives in VA, in FQR; (c) who practices law in VA and in FQR; (d) whose law office is situated in FQR; (e) whose conduct is at issue regarding a lawsuit he initiated *in that very court*, thereby, affirmatively invoking the court's exercise of *in personam* jurisdiction over him; (f) the allegedly sanctionable lawsuit at issue was filed on behalf of his client, McCarthy, who is also a FQR resident and domiciliary, VA-licensed attorney who regularly conducts business and maintains an office in FQR, and on whose behalf Hawes invoked the court's exercise of *in personam* jurisdiction; (g) Hawes had been *personally served in FQR*, 4.5 months in advance of the hearing date; (h) For the previous three years, since *at the latest*, 10/11/13, when Leiser filed his first motion for sanctions contained within his responsive pleading (**Ex. B** at pp. 5-6), Hawes had been on

notice that his conduct, in filing the complaint (**Ex. A**), was sanctionable; and (i) he was present in court that morning of the hearing. (**Ex. DD** at 4:11-21).

29. In juxtaposition to the incontrovertible facts stated in ¶ 26, *supra.*, Hawes had been allowed to withdraw as counsel of record—the only fact "supporting" the decision of Judge #2 to dismiss Hawes for lack of *in personam* jurisdiction. (**Ex. DD** at 26:14-29:20; 30:21-33:20; 37:1-9; 48:19-49:8).

30. That the single fact stated in ¶ 26 was sufficient to overcome the mountain of countervailing and incontrovertible facts contained in ¶ 27, in determining that Hawes did not have sufficient "minimum contacts" with Virginia to allow the court to constitutionally exercise *in personam* jurisdiction over him, is unconscionable, because it either reveals a shocking lack of understanding of a basic constitutional principle by a circuit court judge, or else betrays a transparent attempt by Judge #2 to conceal his disregard, at least in this instance, for the rule of law.

31. One or the other conclusion must be drawn from ¶ 28, *supra.*, and both are unacceptable and unconstitutional. Whether through dereliction of duty by failing to learn a basic constitutional principle of nearly universal application, or by cynical, intentional, and flagrant disregard for the rule of law, the decision-making process was corrupted by a decision-maker whose rulings so far deviated from anything the rule of law would remotely support, they cannot be considered constitutional.

32. Tellingly, when Leiser argued that the trial court was obligated to adopt an interpretation of the provision of the suspending order which would render that order *meaningful* as opposed to *meaningless*—a seemingly fundamental legal principle that should not require citation to legal authority in order to persuade a circuit court judge of its validity—the trial court insisted

Leiser cite some legal authority for that proposition.  (**Ex. DD** at 40:8-43:5; 46:15-48:13).

33. By contrast, when Hawes argued that the court could not exercise *in personam* jurisdiction over him because he had withdrawn as counsel in that case, a novel proposition that is absurd on its face, Judge #2 adopted it, despite the absence of any citation to supporting legal authority contained within Hawes' brief (**Ex. AA**), and without bothering to inquire of Hawes whether he could cite to any legal authority that would support his proposition.  (**Ex. DD** at 5:14-19; 6:14-21; 32:21-33:20; 34:18-35:18; 37:1-10).

34. The disparate treatment Judge #2 afforded the legal propositions argued by each side, supports the inference that the second conclusion of ¶ 28 more likely applies.

### C.  Leiser's MTR

35. Judge #2 abdicated his responsibility to adjudicate a motion (Leiser's MTR) (**Exs. EE, FF, and GG**) that was properly before him, thereby unconstitutionally denying Leiser a meaningful opportunity to be heard.[30]

### D.  VSC's Decisions

36. A trial court's decision whether to impose sanctions is reviewed on appeal based upon an abuse of discretion standard, *Flippo v. CSC Assocs., III, L.L.C.*, 547 S.E.2d 216, 227 (2001).

37. Review of a trial court's decision under an abuse of discretion standard is governed by the following principles:

> . . . [W]hen a decision is discretionary, we do not mean that the [trial] court may do whatever pleases it.  The phrase means instead that the court has a range of choice, and that its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law . . . An abuse of discretion . . . can occur in three principal ways:  when a relevant factor that should have been given significant weight is not considered; when an irrelevant or

---

[30] Judge #2 was not required to conduct a hearing on Leiser's MTR, but it was his job to read, consider, and rule upon that motion, which was properly before his court.

> improper factor is considered and given significant weight; and
> when all proper factors, and no improper ones, are considered, but
> the court, in weighing those factors, commits a clear error of
> judgment. . . . The Fourth Circuit has recognized this definition . . .
> [a]nd we now embrace it. *Landrum v. Chippenham & Johnston-*
> *Willis Hosps., Inc.*, 717 S.E2d 134, 137 (2011).

38. In refusing Leiser's petition for appeal, a decision VSC characterizes as "on the merits,"

*Sheets v. Castle*, 559 S.E.2d 616, 619 (2002), the trial court, and VSC by extension—since its

refusal of Leiser's petition for appeal constituted a tacit affirmance of the trial court's 11/1/16

order, *Id.*—disregarded the following factors that should have informed the exercise of its

discretion:

(a) Leiser had timely filed his motion for sanctions three years earlier, as part of his

responsive pleading to the FQR complaint.

(b) Leiser's motion for sanctions was improperly "put on ice" by Judge #1, who erroneously

deemed it to have been prematurely filed.

(c) Subsequently, Leiser's motion for sanctions was denied—albeit, without prejudice—a

ruling suggesting a decision on the merits, rendered without affording Leiser with notice

or the opportunity to be heard, in violation of both the 14th Amendment and Art I, § 11 of

the VA constitution.

(d) Judge #1 had expressly and repeatedly assured Leiser, both verbally, and through the trial

court's orders, that his motion for sanctions remained pending, did not need to be refiled,

and would ultimately be adjudicated by the trial court.

(e) Consistent with the multiple expressions of its intent to conduct a hearing on a motion for

sanctions filed by Leiser against both McCarthy and Hawes, the trial court entered,

contemporaneously with its 2/10/16 nonsuit order, an order scheduling a hearing on

"Leiser's motion for sanctions against McCarthy and Hawes[,]" which made no mention

of the word, "pending."  (**Ex. L**).

(f) Consistent with its multiple expressions of its intention to adjudicate a motion for sanctions filed by Leiser against McCarthy and Hawes, the trial court entered a suspending order, which expressly stated that it was the court's specific intent to afford Leiser the opportunity to be heard concerning his pending motion for sanctions against McCarthy and Hawes.  (**Ex. M**).

(g) That very same suspending order, containing the single instance of the extraneous word, "pending," also "ORDERED . . . the entry of the non-suit order . . . suspended until further order of this Court, . . ." and stated it "shall become a final order only after . . . the entry of an order . . . disposing of the merits of Leiser's motion for sanctions against McCarthy and Hawes."

(h) Judge #1 should be charged with knowledge of his own orders and the procedural status of a case he alone had adjudicated over the previous 2.5 years.  And on that note, the references to a motion for sanctions against "McCarthy and Hawes," contained in both the 2/10/16 scheduling order (**Ex. L**), and the 2/24/16 suspending order (**Ex. M**), *could not have* referred to a pending motion because Judge #1, who entered both of those orders, is charged with knowledge that as of the dates of entry of both orders, no motion for sanctions had ever been filed against Hawes in that case.  Thus, those orders reflect that Judge #1 must have contemplated that Leiser would file, post-nonsuit, a motion for sanctions against both McCarthy and Hawes, consistent with those two orders.

(i) The fact that on 5/4/15 Judge #1 had improperly "denied" Leiser's motion for sanctions, but had done so "without prejudice" (**Ex. H**) compels the conclusion that he intended to afford Leiser the opportunity to file a sanctions motion at some future date.

(j) Allowing Leiser to argue the merits of his sanctions motion would not prejudice either McCarthy or Hawes because: (i) they are both attorneys who had signed, filed, and vigorously prosecuted a frivolous complaint which they were on notice was sanctionable; (ii) Leiser filed his initial motion for sanctions as part of his responsive pleading (**Ex. B**) at a time when Hawes was still counsel of record, and therefore, on notice that he could become a target of a motion for sanctions.[31]

39. In refusing Leiser's petition for appeal, VSC ignored its own precedents holding that the imposition of sanctions is compulsory when sanctionable misconduct has occurred. Because it is a decision "on the merits," VSC's refusal of Leiser's petition suffers from the same constitutional infirmities as the trial court's.

40. In refusing Leiser's petition for appeal, VSC ignored its own precedents concerning the factors to evaluate in order to assess whether a particular litigant has sufficient "minimum contacts" with VA to constitutionally permit that court's exercise of *in personam* jurisdiction over him. Because it is a decision "on the merits," VSC's refusal of Leiser's petition suffers from the same constitutional infirmities as the trial court's.

41. VSC concedes that the reason(s) for a refusal of a petition for appeal cannot be discerned from its boiler-plate, conclusory orders refusing petitions for appeal. *Sheets* at 559 S.E.2d at 619.

42. But because VSC's decision refusing a petition for appeal is a decision "on the merits," VSC is obligated, by the 14th Amendment, to articulate the legal and factual bases for that decision, which extinguishes a litigant's property rights. *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Matthews v. Eldridge*, 424 U.S. 319 (1976).

43. It necessarily follows that VSC's boilerplate, conclusory orders refusing petitions for appeal

---

[31] See also, 9/28/15 colloquy reproduced at p. 15, *supra.*

(**Ex. JJ**) unconstitutionally deprived Leiser of his right to procedural due process of law, by failing to adequately inform him of the reasons his government, through its judicial branch, deprived him of his property right, consisting in his claim for sanctions, the imposition of which were mandatory under VA. CODE ANN. § 8.01-271.1.

44. Unless it decides to abrogate or modify a particular rule of law, or carve out an exception thereto, it would be unconstitutional for VSC to arbitrarily refuse to apply to the facts of a particular dispute, what is incontrovertibly the law governing that dispute.

45. It necessarily follows, then, that VSC can exercise discretionary appellate review, *or* it can characterize its decisions denying appellate review as decisions that are "on the merits," but it cannot, constitutionally, do both, since the exercise of its "discretion" to refuse a petition for appeal constitutes a decision "on the merits."[32]  As a matter of *law*, then, VSC cannot exercise

---

[32] To see that this is true, Plaintiff postulates a properly perfected, procedurally pristine petition for appeal, meaning it contains no procedural errors that would warrant dismissal on purely procedural grounds.  Suppose that petition for appeal clearly identifies what is unequivocally reversible error, because it misapplies a well-settled legal principle that changed the outcome of the case.  Could VSC, in the exercise of its "discretionary appellate review," refuse that petition?  If the answer is, "no," then saying VSC exercises "discretionary" appellate review is like saying a fire chief exercises his "discretion" to fight only those fires that are actually burning; or like a lifeguard claiming he exercises his "discretion" to save only those people who are in imminent danger.  The point is, none of those examples represents a true exercise of "discretion."  They merely provide accurate job descriptions.  A fire chief fights fires.  A lifeguard saves people in distress in the water.  An appellate court fixes reversible trial court errors.

On the other hand, if the answer to the question is, "yes," VSC can exercise its discretion to refuse a petition for appeal that clearly contains reversible error, that means VSC can arbitrarily decide *not to* apply well-settled legal principles, not disclose to the litigants it is deviating from those settled doctrines; and remain silent as to what is being substituted in place of those well-settled principles.  Because if a decision refusing a petition for appeal is a decision "on the merits," then refusing the hypothetical petition for appeal described above is tantamount to VSC saying that the well-settled legal doctrine that was postulated to govern the case does not, in fact, govern the case.  Thus, if we assume the truth of the following hypothesis:  ***A petition for appeal contains reversible error because it misapplies a well-settled legal doctrine that changed the outcome of the case***, that necessarily leads to the contradictory, mutually exclusive, and therefore wrong conclusion that the well-settled legal doctrine *does not* govern the case.  It must

discretionary appellate review.

46. As a matter of *fact*, upon information and belief, VSC's own statistics demonstrate that VSC does indeed refuse petitions for appeal like the one postulated above—procedurally pristine, and correctly identifying reversible error.[33]

47. Leiser contends the real reason for VSC's refusal of his petition for appeal had nothing to do with its merits; instead, he believes, and absent an explanation from that court, the only reasonable inference to be drawn from its refusal of his petition is that it was based on VSC's inaccurate and irrelevant perception that Leiser was launching an *ad hominem* attack on the trial court judges who had adjudicated the FQR case between him and McCarthy.[34]

---

be, then, that VSC cannot, constitutionally, exercise discretionary appellate review, while simultaneously characterizing its decisions denying appellate review as decisions that are "on the merits."

[33] Leiser has obtained from VSC its statistics from 11/25/85—about the time of the inception of the VA Court of Appeals—through 12/31/16. (That start date was selected so that the data would not be skewed by criminal and domestic relations appeals which, thereafter, were diverted to the Court of Appeals). As a matter of law, the number of circuit court judges allocated to a particular county is based upon that county's population. Thus, a county with twice the population as a neighboring county would typically have about twice as many circuit court judges, reflecting the reality that as population doubles, so should the number of lawsuits and the number of appeals, and so should the number of reversible errors. Therefore, unless VSC's own statistics reveal that the number of petitions for appeal it has granted over the 30+ years worth of data has increased at approximately the same rate as the population, that will cast considerable doubt on VSC's assertion that "the refusal of a petition for appeal is based upon the merits of the case." *Sheets* at 559 S.E.2d at 619. Upon information and belief, the data will show, once fully analyzed, that the true ceiling on the number of petitions for appeal granted by VSC is determined by that court's determination and establishment of its own workload. While there is certainly nothing intrinsically wrong with that, it becomes unconstitutional when the refusal of a petition for appeal—a decision that is "on the merits,"—is based upon criteria other than the "merits." As an aside, although SCOTUS exercises discretionary appellate review, the critical distinction is that, contrary to VSC's characterization of its decisions denying discretionary appellate review, according to SCOTUS, *its* decisions denying discretionary appellate review *are not* considered decisions "on the merits" of the case. *Boumedine v. Bush*, 550 U.S. 1301 (2007).

[34] At the 5/19/17 writ panel hearing, none of the Justices asked any questions of Leiser, but two of them let it be known that they did not approve of what they mischaracterized as his *ad hominem* attacks on Judge #1 and Judge #2, and one of them characterized his arguments, which were incorrectly viewed as premised on those *ad hominem* attacks, as "weak."

48. First, Leiser's criticisms were not *ad hominem* attacks on the trial court judges because there was nothing gratuitous about those attacks. The attacks were on the rulings themselves not the judges. In fact, Leiser went to significant effort (as he has here) not to highlight the identities of the particular judges. But he made the point that the rulings reflect either gross incompetence or judicial chicanery, or both. Leiser stands by those comments. And there was nothing "weak" about his arguments.

49. Second, had Leiser launched an *ad hominem* attack on a judge that VSC found inappropriate, that would not justify its decision to deprive Leiser of his substantive and procedural due process rights. His rights to have meaningful access to the courts is not contingent upon a trial court judge's or VSC's approval of his tone or attitude.

50. This case is not an anomaly. It reflects standard operating procedure for many trial court judges, albeit, a particularly egregious example. But while it shocks the conscience, it comes as no surprise. As a litigant in several courts throughout this Commonwealth, Leiser has routinely encountered the kind of chicanery illustrated by this case. And VSC has fairly routinely refused to correct, let alone even address the problem. The constitutional deprivations explained in this Complaint have frequently occurred, and Leiser, who is currently a litigant in several other cases in VA state courts and who is very likely to be a future litigant in those courts, is likely to encounter these constitutional deprivations again. Even if the underlying FQR case were to terminate, that would not constitute a basis for dismissal of this action, because the constitutional violations described herein are capable of repetition, yet evading review.

### VI. CAUSES OF ACTION

    A. The 11/1/16 order entered by Judge #2 in his capacity as Judge, *pro tempore* of

the Fauquier County Circuit Court, whereby that court granted McCarthy's motion to strike Leiser's sanctions motion pleadings, unconstitutionally deprived Leiser of his property right in his motion for sanctions, without due process of law, in violation of Amend. XIV, § 1.

B.  That same order, which dismissed Hawes as a respondent to Leiser's sanctions motion, on the grounds that Hawes was not subject to the exercise of the court's *in personam* jurisdiction as a result of his withdrawal as counsel from the case, unconstitutionally deprived Leiser of his right to pursue his claim for sanctions against Hawes, without due process of law, in violation of Amend. XIV, § 1.

C.  In refusing Leiser's petition for appeal, a decision characterized by VSC as a decision "on the merits" of the case, VSC tacitly affirmed the trial court's unconstitutional order of 11/1/16, and thereby deprived Leiser of his substantive and procedural due process rights, in violation of Amend. XIV, § 1.

## VII.  CONCLUSION

As the FQR case so aptly demonstrates, too many VA trial court judges don't know the law; some, apparently, have no intention of learning it; and others presumably know it, but intentionally and flagrantly disregard it,[35] under cover of darkness provided by VSC, which, wittingly or not, employs the opacity of its decision-making process to protect trial court judges from unwanted scrutiny and criticism of their dispositive decisions. But the *only legitimate* protection from criticism to which judges are entitled is that which comes from their fidelity to the rule of law.

As the FQR case so stunningly confirms, We, the People, cannot have a justice system

---

[35] All of which is conspicuously demonstrated by the decisions of Judge #1 and Judge #2.

governed by the rule of law when many of the decision-makers either don't know the law or else refuse to apply it, in order, instead, to pursue their agenda *du jour*, and consequently, do whatever they *feel* like doing, instead of what the law *compels* them to do.

Finally, VSC takes the position that a litigant is not entitled to know why the judicial branch of his government has extinguished his property rights, by dismissing a claim or overruling a defense to a claim. It takes the position that it can extinguish those constitutionally protected rights in silence, without revealing the reasons for its decision depriving him of his property. In holding that view, VSC is operating under a gross conceptual error. We, the People, will never place our unconditional trust in *any* government official or government institution—including VSC. To paraphrase Ronald Reagan, We will trust; but We will verify. And that verification must come through *our* ears and eyes. When the government extinguishes a person's property rights through a decision of a judicial nature, it owes that person an explanation articulating the legal and factual bases for that decision. It is time for VSC to either change the *status quo ante* of the justice system over which it presides, or else, defend it, in writing, to Us, the People. That is the purpose of this § 1983 lawsuit.

WHEREFORE, Plaintiffs, PHILLIP B. LEISER, Esq. and CREATIVE LEGAL SOLUTIONS, PLLC (*f.k.a.* The Leiser Law Firm, PLLC) respectfully request this Honorable Court enter a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, finding the foregoing actions of Judge #2 in entering his 11/1/16 order, and VSC's decision refusing Leiser's petition for appeal, to be in violation of 42 U.S.C. § 1983, because they deprived him of his constitutional rights to both substantive and procedural due process of law, in violation of Amend. XIV, § 1.

Respectfully submitted,

PHILLIP B. LEISER, Esq., *pro se*

and

CREATIVE LEGAL SOLUTIONS, PLLC, by Counsel
(*f.k.a.* The Leiser Law Firm, PLLC)

/s/ Phillip B. Leiser, Esq.

_____
Creative Legal Solutions, PLLC
(*f.k.a.* The Leiser Law Firm, PLLC)
by: Phillip B. Leiser, Esq.
2295 Village Crossing Road, #302
Falls Church, Virginia 22043
TEL:   (703) 734-5000, ext. 101
FAX:   (703) 734-6000
Email: pbleiser@leiserlaw.com
VASB # 41032
*Counsel for Plaintiffs*